1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

10

EASTERN DISTRICT OF CALIFORNIA

11

12 | LENA M. LITTLE,                    Case No.  1:14-cv-00795-SKO

13 |                                    **ORDER AFFIRMING THE ALJ'S**
                    Plaintiff,          **DECISION**

14 |          v.                        (Doc. No. 1)

15 | CAROLYN W. COLVIN,
16 | Acting Commissioner of Social Security,

17 |
                    Defendant.
18 |
19 | _____

20 |                           **INTRODUCTION**

21          Plaintiff Lena M. Little ("Plaintiff") seeks judicial review of a final decision of the

22 Commissioner of Social Security (the "Commissioner" or "Defendant") denying in part[1] her

23 application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")

24 pursuant to Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 405(g); 1383.  The matter

25 is currently before the Court on the parties' briefs, which were submitted, without oral argument,

26 to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

27 _____

[1]  The ALJ found Plaintiff disabled as of October 14, 2011, but not disabled prior to that date.

28
[2]  The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 5, 10.)

**FACTUAL BACKGROUND**

Plaintiff filed an application for DIB and SSI on April 17, 2008, alleging disability beginning on March 13, 2007, caused by Post-Traumatic Stress Disorder ("PTSD") and bipolar disorder.  (Administrative Record ("AR") 79, 84.)

**A.      Relevant Evidence**

On June 7, 2008, Plaintiff underwent a psychiatric examination and evaluation by Stefan Lampe, M.D., a Board Certified Psychiatrist.  (AR 190-91.)  Plaintiff reported she suffers from bipolar disorder, and she is often depressed and has no energy.  (AR 190.)  She has been in treatment since she suffered childhood trauma, and she has been hospitalized three times for suicide attempts.[3]  (AR 190.)  Plaintiff reported her daily activities include meal preparation, dusting, mopping, dishes, and laundry, and she enjoys reading and watching television.  (AR 190.)  On examination, Dr. Lampe noted Plaintiff was pleasant, friendly, and cooperative with normal psychomotor functioning; she engaged well, her speech was spontaneous and within normal range, her affect was full range without lability or "expansivity"; her insight and judgment, however, were noted to be poor.  (AR 190.)

Dr. Lampe diagnosed Plaintiff with bipolar disorder and assigned her a Global Assessment of Functioning ("GAF") score of 65.[4]  (AR 191.)  He provided the following discussion of Plaintiff's abilities:

> From a psychiatric point of view, the claimant can relate and interact with supervisors and co-workers.  She can understand, remember, and carry out simple as well as more technical instructions.  She would not have difficulty dealing with the public.  She is able to maintain concentration and attention for two-hour increments.  From a psychiatric standpoint, whether or not the claimant could

---

[3]  As set forth below, Plaintiff has inconsistently reported her prior suicide attempts.  The number of attempts she claims has vacillated over time from none to five.  *Compare, e.g.,* AR 190 (in 2008 reporting three prior suicide attempts) *with* AR 520 (in 2010 reporting no prior suicide attempts).

[4] The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning."  Am. Psychiatric Ass'n, Diagnosis & Statistical Manual of Mental Disorders 32 (4th ed. 2000).  The clinician uses a scale of zero to 100 to consider "psychological, social, and occupational functioning on a hypothetical continuum of mental health- illness," not including impairments in functioning due to physical or environmental limitations.  *Id.* at 34.  A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well.  *Id.*

withstand the stress and pressures associated with an eight-hour workday on an ongoing basis would depend on whether or not her mood is stabilized adequately.

(AR 191.)

On July 11, 2008, state-agency physician A. Garcia, M.D., reviewed Plaintiff's records and completed a mental residual functional capacity assessment form.  (AR 203-05.)  He opined Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions.  (AR 203.)  In all other areas, he found Plaintiff "not significantly limited."  (AR 203-05.)  He opined Plaintiff would be able to maintain concentration and attention for more than two-hour increments; sustain an eight-hour per day, forty-hour workweek; relate to and accept direction from supervisors; remain socially appropriate with co-workers and the public without being distracted by them; and could travel, respond to change, and set realistic goals independently.  (AR 204.)

On October 25, 2007, Plaintiff was seen at the Tuolumne Me-Wuk Indian Health Center ("Tuolumne") by Nurse Practitioner Lorie Weldon ("Weldon").  (AR 234-35.)  Plaintiff reported increased depression and pain in her right leg stemming from a fall, and it was noted she had been without pain medication for several months.  (AR 234.)  Plaintiff reported increased suicidal thoughts, but she denied at the examination that she wanted to hurt herself.  (AR 234.)  Plaintiff was noted to be anxious in the examination room, and she exhibited scattered thoughts and jumped from topic to topic.  (AR 234.)  She was diagnosed with depression and PTSD, and it was indicated she needed to restart antidepressants.  (AR 235.)  Plaintiff was encouraged to make an appointment at King's View to start psychiatric care and obtain counseling.  (AR 235.)  Effexor samples were provided to Plaintiff.  (AR 235.)

Plaintiff was seen by Weldon at a follow-up appointment on November 26, 2007, where she stated she was responding well to the Effexor medication, and she denied any symptoms other than sinusitis.  (AR 233.)  On December 13, 2007, Plaintiff was again seen by Weldon for a recent knee injury and right knee pain.  (AR 231.)  She stated she was doing well on Effexor, but believed she would benefit from an increased dosage, which was prescribed.  (AR 231.)

On February 12, 2008, Plaintiff was again seen by Weldon for skin abscesses and a fever. (AR 229.)  She was prescribed an antibiotic, and she was prescribed an increased dosage of Xanax for her anxiety.  (AR 230.)

On March 4, 2008, Plaintiff was examined by Weldon upon reporting a motor vehicle accident the week prior to the examination.  (AR 227.)  Plaintiff reported increased feelings of depression, suicidal thoughts, and mood swings; she believed the Effexor was making her worse. (AR 227.)  Two friends with whom she was living accompanied her to the examination and explained to Weldon that Plaintiff was experiencing mood swings and that they believed she may be having flashbacks from her past abuse.  (AR 227.)  Weldon indicated in her assessment that Plaintiff's increased suicidal thoughts and mood swings appeared to comprise a "bipolar picture," and that Weldon consulted with Dr. Johnson and Dr. Hoffmann, who agreed Plaintiff presented with a "bipolar picture."  (AR 228.)  The treatment plan included tapering off the Effexor, and Plaintiff was started on Seroquel.  Her friends were instructed to seek immediate care for Plaintiff if she became "more suicidal."  (AR 228.)

At a follow-up appointment on April 2, 2008, post-gastric bypass surgery, Plaintiff reported doing well on Seroquel and that she was sleeping well.  (AR 225.)  She was still experiencing depressive symptoms during the day, and her friends who accompanied her to the appointment confirmed that Plaintiff appeared depressed, wanted to sleep more, and exhibited a lack of motivation.  (AR 225.)  Plaintiff was continued on Seroquel, and was started on Zoloft. Weldon also recommended Plaintiff follow-up with Physician's Assistant Cassie Blackwell ("Blackwell") for psychiatric management, to which Plaintiff agreed.  (AR 226.)

On March 11, 2009, state agency physician S. Tyutyulkova, M.D., reviewed Plaintiff's medical records and completed a psychiatric review technique form indicating that Plaintiff's psychiatric condition was non-severe.  (AR 245-58.)  Dr. Tyutyulkova noted that Plaintiff's symptoms were vague, and there was no evidence to support a diagnosis of bipolar disorder. (AR 245.)

On April 15, 2009, Weldon signed a letter, which was co-signed by Dr. Kenneth Renwick, a family physician, indicating that Plaintiff was unable to work due to her bipolar disorder, PTSD,

and an anxiety disorder.  (AR 278.)    Plaintiff was described as easily distracted with racing thought patterns that interfere with her ability to focus and interact with others in a social environment, and she was forgetful.  (AR 278.)  Plaintiff was encouraged to seek management for her bipolar disorder to help stabilize her condition.  (AR 278.)

On July 9, 2009, Plaintiff followed-up with Weldon for medication refills.  She reported experiencing increased stress and anxiety and had not been sleeping well.  (AR 300.)   She admitted she had not seen her psychiatrist or psychologist in several months, and acknowledged she needed to follow-up in regard to her medication and management for her bipolar disorder.  (AR 300.)

On August 20, 2009, Weldon and Dr. Hoffmann signed a questionnaire they completed regarding Plaintiff's impairments, which was sent to Dr. Renwick.  (AR 280-87.)  Weldon and Dr. Hoffmann indicated Plaintiff was diagnosed with bipolar disorder, depression, PTSD, anxiety, chronic pain caused by lumbar spondylosis and bulging discs, osteopenia, and allergic rhinitis.  (AR 280.)    They opined Plaintiff's impairments were affected by her anxiety in new and unfamiliar surroundings, her poor coping mechanisms, and they indicated her mood seemed to escalate her physical pain symptoms.  (AR 285.)  They opined she was capable of low stress, but that she would need breaks to rest at unpredictable intervals.  Plaintiff's impairments were likely to produce good days and bad days, and, although they noted it was difficult to predict, they opined Plaintiff would miss work due to her impairments anywhere from one to three days per month.  (AR 286.)

On September 8, 2009, Plaintiff saw Weldon for a follow-up after an emergency room visit due to being struck in the face by another individual.  (AR 294.)  Her Xanax prescription was renewed and it was noted she had an appointment with Blackwell for management of her bipolar disorder.  (AR 295.)

On November 5, 2009, Weldon completed a mental capacities worksheet setting forth her opinion of Plaintiff's functional abilities.  (AR 331-32.)  She noted Plaintiff had bipolar disorder, depression, and anxiety.  (AR 331.)  She reported Plaintiff had a difficult time focusing and found it difficult to complete tasks.  (AR 331.)  Plaintiff had difficulty dealing with others in a work

environment.  (AR 331.)  She described Plaintiff as self-conscious and who took certain actions of others personally, which created a greater degree of anxiety and depression.  (AR 331.)  Although Plaintiff could follow oral and written instructions, she might have difficulty focusing at times. (AR 331.)

In March 2010, Plaintiff was seen by Weldon for a follow-up after a visit to the ER where she was diagnosed with bronchitis.  (AR 299.)  No psychological symptoms were noted or discussed.  (AR 399-400.)

In August 2010, a psychiatric questionnaire regarding Plaintiff's limitations was completed by a person at Tuolumne, but the document in the record is unsigned.[5]  (AR 406-12.)  The form indicates Plaintiff had bipolar disorder and a mood disorder, marked by symptoms including sleep disturbances, mood disturbances, emotional lability, substance dependence, recurrent panic attacks, suicidal ideation, obsessions or compulsions, intrusive recollections of a traumatic experience, and generalized persistent anxiety.  (AR 407.)  Plaintiff was noted to be "markedly limited," which was defined as being precluded from performing activities in a normal, 40-hour-per-week work environment.  (AR 408.)

In September 2010, at an appointment with Blackwell, Plaintiff exhibited rapid talking and reported rapid thoughts with some difficulty falling asleep.  (AR 510.)  Her medication compliance was noted to be good and her appearance normal, but she was anxious, her speech was rapid, and her affect was expansive.  She was diagnosed with bipolar disorder and PTSD. (AR 510.)  Blackwell started Plaintiff on Lamictal, and continued her Seroquel and Xanax prescriptions.  (AR 510.)

At another examination with Blackwell in March 2011, Plaintiff reported difficulty going to sleep.  (AR 511.)  Her medication compliance was noted to be fair, but she appeared unkempt and exhibited psychological agitation with rapid speech and a manic mood.  (AR 511.)  At another follow-up appointment at the end of March 2011, Plaintiff was "doing better" overall, but she was

---

[5] This document was discussed at the hearing before the ALJ, and Exhibit 21F was ascribed to Weldon.  (*See* AR 897-98.)

still very distracted with racing thoughts.  (AR 509.)  She was noted to be anxious and her affect was constricted.  (AR 509.)

At a follow up appointment with Blackwell on August 1, 2011, Plaintiff reported she had lots of stress at home with which she was not dealing well.  (AR 508.)  She was experiencing racing thoughts and difficulty sleeping.  (AR 508.)  On examination, Plaintiff was noted to appear unkempt, and her affect was expansive.  (AR 508.)  She was noted to have poor impulse control, concentration and attention, and insight and judgment.  (AR 508.)  She was diagnosed with bipolar disorder, PTSD, and a personality disorder.  (AR 508.)

On August 15, 2011, Blackwell completed a psychiatric impairment questionnaire about Plaintiff's functional abilities.  (AR 512.)  She indicated she began treating Plaintiff in June 2008, but the frequency of her treatment was sporadic and since March 2011 had been every 8 to 10 weeks.  (AR 512.)  She diagnosed Plaintiff with PTSD, bipolar disorder, and a personality disorder.  She assigned Plaintiff a GAF score of 50, and indicated her prognosis was poor for remission in the next 12 months.  (AR 512.)  In checkbox format, she noted Plaintiff had poor memory, sleep disturbances, personality changes, mood disturbances, emotional lability, recurrent panic attacks, anhedonia, psychomotor agitation, feelings of guilt, difficulty thinking or concentrating, suicidal ideation, oddities of thought, social withdrawal, manic syndrome, persistent irrational fears, intrusive recollections of a traumatic experience, persistent irrational fears, generalized persistent anxiety, somatization, and pathological dependence.  (AR 513.)  She listed Plaintiff's primary symptoms as pervasive anxiety, insomnia, mood instability, and poor concentration and focus.  (AR 514.)

She indicated Plaintiff's abilities were markedly limited in the following areas: remembering locations and work-like procedures, understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention concentration for extended periods, performing activities within a schedule and maintaining regular attendance, sustaining an ordinary routine without supervision, working in coordination with or proximity to others without being distracted by them, completing a normal workweek without interruptions from psychologically based symptoms, accepting instructions and responding appropriately to criticism

from supervisors, getting along with co-workers or peers without distracting them, maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness, responding appropriately to changes in the work setting, and traveling to unfamiliar places or use of public transportation.  (AR 515-17.)

She also found Plaintiff moderately limited in the following abilities:  understanding and remembering one- or two-step instructions, carrying out simple one- or two-step instructions, making simple work-related decisions, interacting appropriately with the general public, being aware of normal hazards and taking appropriate precautions, and setting realistic goals or making plans independently.  (AR 515-17.)  Blackwell indicated Plaintiff would be unable to tolerate even "low stress" in a work environment and would likely miss work more than three times per month. (AR 518-19.)

On October 14, 2011, Plaintiff saw Carol W. Fetterman, Ph.D., for a psychological testing evaluation.  (AR 520-26.)  Dr. Fetterman observed that Plaintiff presented in a friendly manner, made good eye contact, and her facial expressions were normal.  (AR 520.)  She was scattered and speedy, however.  (AR 520.)  She reported having no suicide attempts or psychiatric hospitalizations, completing the 11th grade, having a learning disability, and being placed in special education.[6]  (AR 520-21.)  Dr. Fetterman listed a diagnostic impression of bipolar disorder by history, amnestic disorder, and assigned a GAF score of 60.  (AR 522.)

Dr. Fetterman administered several tests including the WAIS-IV, the WMS-IV, and the Bender-Gestalt-II.  (AR 522.)  Dr. Fetterman opined Plaintiff's ability to understand, remember, and carry out job instructions was markedly impaired as evidenced by performance on the mental status examination and on psychological testing.  (AR 522.)  Her ability to maintain attention, concentration, persistence and pace was assessed to be mildly impaired as was her ability to relate and interact with supervisors, co-workers, and the general public.  (AR 523.)  Her ability to adapt to day-to-day work activities, including attendance and safety was also mildly impaired. (AR 523.)  Dr. Fetterman diagnosed Plaintiff with Amnestic Disorder.  (AR 522.)

[6] Contrarily, in her application for benefits, Plaintiff indicated she completed high school and she did not attend any special education classes.  (AR 88.)  She also testified at the hearing that she graduated from high school and completed post-secondary training as a certified CNA. (AR 822-23.)

**B.      Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 77-102, 129-60, 185-89, 197-99.)  A hearing was held on August 24, 2010, before an ALJ.  (AR 818-44.)  The ALJ issued a decision on October 6, 2010, finding Plaintiff not disabled.  (AR 416-27.)  Plaintiff sought review of the ALJ's decision before the Appeals Council (AR 436), which was granted (AR 433-34).  On July 12, 2011, the Appeals Council remanded the case to the ALJ for further consideration of Weldon's treatment records, to obtain additional evidence which could include a consultative mental status examination, give further consideration to Plaintiff's RFC during the entire period at issue providing rationale with specific references to the record in support of the assessed limitations, and obtain supplemental evidence from a vocational expert to clarify past relevant work and the effect of the assessed limitations on Plaintiff's occupational base.  (AR 433-34.)

Upon remand, on February 21, 2012, the ALJ conducted a second hearing.   (AR 845-71.)  As Plaintiff required additional time to obtain outstanding medical records of an alleged suicide attempt, a third hearing was held June 5, 2012.  (AR 872-921.)

**1.      Plaintiff's Testimony at the August 2010 Hearing**

Plaintiff testified about her symptoms and limitations at the hearing.  She explained that she did not drive because she could not seem to focus or concentrate, but she also noted that her license had been suspended due to an outstanding traffic ticket she was unable to pay.  (AR 831-32.)  She performs a few tasks around her parents' home where she lives, including setting the table, turning the television on, and walking two small dogs.  (AR 830.)  She watches television for about two hours at a time.  (AR 833.)  She has a cell phone, and she uses it to text.  (AR 833.)

She stopped working at Tuolumne in 2007 because she was told her services were no longer needed.  (AR 835.)  She went to see her doctor at Tuolumne who told her she should not work because of a lower back problem and anxiety issues.  (AR 835.)  Her doctor also told her the reasons why she was fired because she worked at the same clinic where her doctor is located.  (AR 835.)  Plaintiff did not know all the reasons why her position was terminated; she was only

told that there was a patient's registration form in the wrong chart.  (AR 836.)  That was the first time she had mixed up the chart, and all her work had been satisfactory until that point.  (AR 836.)  However, her doctor told her that there had been numerous other filing mistakes although Plaintiff was never spoken to or written up for those mistakes.  (AR 836.)

Plaintiff stated she had attempted suicide five times, and was hospitalized in February 2007 or 2008 after one attempt.  (AR 837.)  She had been in a car accident, but she could not remember the exact date because her memory was "gone."  (AR 838.)  She sees Blackwell for treatment, and Blackwell is adamant that Plaintiff not work.  (AR 839.)

## 2.   Plaintiff's February 2012 Hearing Testimony

Plaintiff also testified at a second hearing in February 2012.  (AR 845-71.)  She stated she completed high school and some college.  (AR 855.)  She was a receptionist at Tuolumne until March 2007.  (AR 856.)  Her problems are mainly psychological, but she also experiences lower back pain from a fall.  (AR 856.)  She has bone spurs in her heels, arthritis in both shoulders, and a "messed up" right knee.  (AR 857.)  Her mental issues include an inability to focus or concentrate on the simplest task, no matter what it is.  (AR 857.)  She is unable to make appointments, focus on chart numbers, or anything to that effect.  (AR 858.)  Blackwell is her counselor, and Dr. Renwick writes her prescriptions.  (AR 859.)  She regularly experiences nightmares, and she takes Seroquel, Xanax, and pain medication.  (AR 865.)  She sometimes experiences "flashbacks" during the day, which put her "into a dark spot at least one to three times a week."  (AR 865.)  When she is in that "dark spot" she feels unloved, unwanted, and totally depressed.  (AR 866.)  She cries, stops speaking to everybody, and does not bathe or brush her teeth.  (AR 866.)  Her mother and her sister take care of her medication because Plaintiff is forgetful.  (AR 867.)  Although she watches television, sometimes she "space[s] out."  (AR 868.)  She thinks about suicide a lot, almost daily.  (AR 868.)  Her last suicide attempt was in 2008 or 2009.

Plaintiff is able to walk her sister's dogs, but usually she sits in the corner with a thousand thoughts going through her head.  (AR 860.)  She may get up and help her mother set the table or do something simple.  (AR 860.)  She has a cell phone on which she texts her daughters; she does not have a driver's license.  (AR 861.)  She stated she was in a "major wreck" in 2009, and she did

not get a ticket, but she has been afraid to drive since then as she experiences panic attacks.  (AR 861.)  Also, her license was suspended due to a speeding ticket.  (AR 861.)  Plaintiff stated she does not drink alcohol, and the last drink she had was in 2006.  (AR 862.)

### 3. Plaintiff's Testimony at the June 2012 Hearing

Plaintiff testified that she completed high school, and holds CNA and RNA certificates, and is a certified activity director.  (AR 855.)  She worked at Tuolumne as a receptionist and in the medical records section.   (AR 856.)   She stopped working on March 13, 2007, due to psychological issues including an inability to focus, and pain in her lower back following a fall. (AR 856.)  Her psychological issues render her unable to focus or concentrate "to do the simplest task, no matter what it is."  (AR 857.)  Her mind does not "comprehend the simplest thing, as number[s] or directions."  (AR 858.)  She has to write things down and re-write them.  (AR 858.) At her last job, she was unable to make appointments, focus on chart numbers, or anything "to that effect."  (AR 858.)  She is receiving mental health therapy from Blackwell who is overseen by Dr. Renwick.  (AR 859.)

She is currently living with her parents.  On a normal day, she will walk her sister's dogs, and will sit in a corner thinking "a thousand thoughts."  (AR 860.)  She does not lie down during the day, but she watches about four hours of television.  (AR 860.)  She does not use a computer for anything, but she does own a cellphone and can use it for calls and texting.  (AR 860.)  She does not have a driver's license and is unable to drive due to panic attacks.  (AR 861.)

Plaintiff testified that her prescription medication causes her to be lightheaded, sleepy, her muscles jolt, and she is constantly tired.  (AR 854.)

### 4. Medical Expert Testimony at the June 5, 2012 Hearing

Shakil Mohammed, M.D., Ph.D., testified as a medical expert at the June 5, 2012, hearing. (AR 872-921.)  Dr. Mohammed is board certified in psychiatry and was a former examiner for the American Board of Psychiatry.  (AR 887.)  From Plaintiff's medical records, Dr. Mohammed determined Plaintiff had been diagnosed with bipolar disorder, but he could find no documentation why it was labeled bipolar disorder as none of the medical records showed hypomanic phases.  Dr. Mohammed felt there were insufficient findings to support a bipolar disorder diagnosis and would

label it a mood disorder instead.  (AR 888.)  Dr. Mohammed also identified a diagnosis for PTSD, anxiety disorder, a personality disorder, and amnestic disorder.  (AR 888-89.)  He opined the amnestic disorder was the most significant because it was documented by the various tests performed by Dr. Fetterman, and it appeared to be a valid diagnosis.  (AR 890.)  Although Plaintiff had complained of memory problems before her examination with Dr. Fetterman in October 2011, there was no prior objective documentation.  (AR 890.)

Dr.  Mohammed agreed with Dr. Fetterman's diagnosis of amnestic disorder.  (AR 890.) Amnestic disorder is a cognitive disorder, although it is not identified as a listed impairment.  Dr. Mohammed categorized it as an impairment fitting under Listing 12.02.  He opined Plaintiff met Listing 12.02 for amnestic disorder as of October 14, 2011.  He emphasized that particular onset date because, before that amnestic disorder was not diagnosed and any functional limitations were not clear.  (AR 895.)  The ALJ specifically questioned whether an earlier onset date for this disorder was possible, but Dr. Mohammed answered that before October 2011, there was little evidence of functional limitations in the record:  limitation to Plaintiff's activities of daily living was mild, social functioning was only mildly limited, and Plaintiff's ability to maintain concentration, persistence, and pace was only moderately limited.  Prior to the findings in the October 2011 report, there was insufficient evidence that Plaintiff met the Listing 12.02 for amnestic disorder, or functional limitation rendering her disabled.  (AR 896.)

Plaintiff's counsel questioned Dr. Mohammed whether, prior to October 2011, it would have been difficult for Plaintiff to maintain consistent attendance at work as a result of her PTSD, anxiety, and concentration problems.  (AR 897.)  Dr. Mohammed answered that there was no medical documentation to that effect, and the first documentation of amnestic disorder which affected concentration and social function was not documented until October 14, 2011.  (AR 897.) Plaintiff's counsel asked whether those problems were in fact documented in the forms submitted by Weldon and Blackwell.  (AR 897.)  Dr. Mohammed answered that, as it pertained to Weldon, she was only a family nurse practitioner, not a psychiatric nurse, and not an acceptable medical source.  (AR 898.)  Blackwell also is not a psychologist or a medical doctor, so she is not an acceptable medical source.  Neither report was co-signed by a medical doctor.  (AR 898.)

1  Plaintiff's counsel asked whether it would matter if the reports were co-signed by a physician, and

2  Dr. Mohammed said the reports would be more persuasive if they were signed by a psychiatrist,

3  and a signature by a medical doctor would not be sufficient to carry persuasive weight if that

4  person is not a specialist in psychiatric illness.  (AR 902.)  He also noted that, although Plaintiff

5  complained of concentration problems prior to October 2011, those were not documented by

6  objective tests showing that this was actually true.  (AR 902.)

7      Dr. Mohammed was also questioned Plaintiff's hospitalization in February 2008.

8  (AR 905.)  Dr. Mohammed stated the notes only referred to a drug overdose; it was not actually a

9  hospital admission but just overnight in the ER, which is a common phenomenon.  (AR 907.)

10      Plaintiff's counsel also asked whether Plaintiff's insomnia and anxiety problems would

11 have created any limitations in her work ability prior to October 2011.  (AR 907.)  Dr. Mohammed

12 responded that although Plaintiff had insomnia for many years, there is no indication of resulting

13 functional limitation.  (AR 908-09.)  Prior to October 2011, Dr. Mohammed felt Plaintiff was only

14 mildly to moderately limited in social functioning, concentration, persistence, and pace, and there

15 were no episodes of decompensation.  (AR 911.)  Based on these mild limitations, Dr. Mohammed

16 opined Plaintiff could perform simple tasks.  (AR 911.)

17      **5.      Testimony of Vocational Expert at the June 5, 2012 Hearing**

18      The ALJ solicited testimony from a Vocational Expert ("VE") about Plaintiff's past work

19 and her ability to perform other work.  (AR 912-19.)  The VE characterized Plaintiff's past work as

20 office clerk typist, Dictionary of Occupational Titles ("DOT") 203.362-010, which is classified as

21 sedentary, semi-skilled work with an SVP of 4 (AR 913); and a residential care provider, DOT

22 354.377-014, which is classified as medium exertional work with an SVP of 3 (AR 914).  She

23 obtained transferrable skills from these jobs.  (AR 914.)

24      The ALJ then posed a series of hypothetical questions, asking the VE to consider an

25 individual of the same age and with the same education and work history as Plaintiff.  (AR 915.)

26 In the first hypothetical, the ALJ asked the VE to consider a person who could sit for six hours,

27 but could stand or walk less than two hours each; lift and/or carry less than 10 pounds; never

28 climb, balance, stop, kneel, crouch, crawl, or work around hazards; would not have sufficient

concentration for even simple, routine repetitive tasks; could have less than occasional public contact; and would need numerous unscheduled work breaks.  (AR 915.)  the VE testified that there was no full-time work that such a person could perform.

In the second hypothetical, the ALJ asked the VE to consider a person limited to jobs involving simple, routine, repetitive tasks; frequent but not constant contact with the public, coworkers, or supervisors; could stand and/or walk six out of eight hours each with normal breaks; could lift and/or carry 50 pounds occasionally, 25 pounds frequently; frequently reach in all directions, handle, finger, feel, push, pull, or use the upper and lower extremities; occasionally climb ladders, ropes, scaffolds; occasionally balance, stoop, crouch, or crawl; frequently climb ramps or stairs; frequently work around unprotected heights or moving mechanical parts of machinery; occasionally operate a motor vehicle; occasionally work around dusts, odors, fumes, and pulmonary irritants; occasionally work around extreme cold, heat, and vibrations; frequently work around loud noises.  (AR 915-16.)  The VE testified such an individual would not be able to perform Plaintiff's past work, but could perform other work:  hand-packager, DOT 920.587-018; cafeteria attendant, DOT 311.477-014; and stock check apparel, DOT 299.667-014.

Plaintiff's counsel also posed a hypothetical for the VE to consider.  (AR 918-19.)  The VE was asked to take the second hypothetical and modify it to a person limited to sitting two out of eight hours per day, and standing and walking only two hours out of eight.  (AR 918.)  The VE testified such a person would be precluded from full-time work.  (AR 919.)

In a third hypothetical, the VE was asked to consider a person who was precluded from maintaining attention or concentration for extended periods of time.  (AR 919.)  The VE testified such a person would be precluded from all work.  (AR 919.)

**6.     The ALJ's August 2012 Decision[7]**

On August 14, 2012, the ALJ issued a decision finding Plaintiff disabled as of October 14, 2011, but not disabled prior to that date.  (AR 22-29.)  Specifically, the ALJ found that Plaintiff (1) had not engaged in substantial gainful activity since her alleged onset date of March 13, 2007 (AR 24); (2) Plaintiff had the following severe impairments as of March 13, 2007: depression,

_____

[7] The prior decision which was reviewed by the Appeals Council is not summarized.

anxiety, degenerative disc disease, and osteoarthritis; as of October 14, 2011, Plaintiff had the following severe impairments:  depression, anxiety, amnestic disorder, degenerative disc disease, and osteoarthritis (AR 24); (3) prior to October 14, 2011, did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1  (AR 25); beginning on October 14, 2011, Plaintiff met the Listing 12.02 (AR 27); and (4) could not perform her past relevant work as of March 13, 2007; prior to October 14, 2011 had the residual functional capacity ("RFC") to perform medium work, with the ability to sit, stand, and walk six hours each during an eight-hour workday, and is limited to work involving simple, routine, and repetitive tasks with frequent public, co-worker, and supervisor contact (AR 25.)  The ALJ found that, prior to October 14, 2011, Plaintiff retained the ability to perform other work such as hand packager, cafeteria attendant, and stock check apparel sorter.  (AR 27).  The ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act prior to October 14, 2011, but became disabled as of October 14, 2011.  (AR 29.)

Plaintiff sought review by the Appeals Council on August 23, 2012.  (AR 17.)   The Appeals Council denied Plaintiff's request for review on March 28, 2014.  (AR 8-12)  Therefore, the ALJ's decision became the final decision of the Commissioner.   20 C.F.R. §§ 404.981; 416.1481.

**D.      Plaintiff's Argument on Appeal**

Although directed by the Appeals Council in 2011 to evaluate the opinions of Weldon and Blackwell, the ALJ failed to do so upon remand.  Instead, the ALJ impermissibly deferred to Dr. Mohammed's opinion that neither Weldon nor Blackwell was an acceptable medical source, and none of the physicians who co-signed Weldon or Blackwell's reports were mental health practitioners.  Those opinions should have been considered and incorporated into Plaintiff's RFC. Plaintiff also argues the ALJ improperly assigned her onset date as October 14, 2011, and failed to adequately consider her lay testimony.

## SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec*., 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

1   The regulations provide that the ALJ must undertake a specific five-step sequential

2   analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine

3   whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§

4   404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the claimant

5   has a severe impairment or a combination of impairments significantly limiting her from

6   performing basic work activities.  *Id*. §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ

7   must determine whether the claimant has a severe impairment or combination of impairments that

8   meets or equals the requirements of the Listing of Impairments ("Listing"),   20 C.F.R. 404,

9   Subpart P, App. 1.  *Id*. §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must

10  determine whether the claimant has sufficient residual functional capacity despite the impairment

11  or various limitations to perform her past work.  *Id*. §§ 404.1520(f), 416.920(f).  If not, in the Fifth

12  Step, the burden shifts to the Commissioner to show that the claimant can perform other work that

13  exists in significant numbers in the national economy.   *Id*. §§ 404.1520(g), 416.920(g).   If a

14  claimant is found to be disabled or not disabled at any step in the sequence, there is no need to

15  consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§

16  404.1520, 416.920.

## DISCUSSION

18  **A.      ALJ's Consideration of Medical Evidence**

19      In considering the medical evidence received from Weldon and Blackwell, the ALJ

20  concurred with the hearing testimony supplied by Dr. Mohammed and gave these records and

21  opinions no evidentiary weight.  (AR 29.)  Specifically, the ALJ explained as follows:

22      Dr. Mohammed fully articulated how both Exhibit 22F[8] and Exhibit 23F completed
        by Lori Weldon and Cassie Blackwell are to be given no weight as they are by non-
23      acceptable medical sources, without the necessary education, experience and
        expertise to properly assess, diagnose, treat or formulate any mental health
24      impairment that the claimant may have.  Therefore, as Dr. Mohammed's expertise
        and experience is far more persuasive in mental health matters, the undersigned
25      similarly gives no weight to these opinions as they are in conflict with and
        inconsistent with the other evidence of record as a whole.
26

27  (AR 29.)

28  _____
    [8] The ALJ appears to have mistakenly referred to Exhibit 22F rather than 21F.  (AR 897-902.)

1

### 1.    Plaintiff's Argument

Plaintiff argues the ALJ erred in assigning no weight to this evidence.  (Doc. 21.)  Plaintiff contends wholly rejecting these records because they were not submitted by an acceptable medical source or co-signed by a mental health specialist is not legally sufficient reasoning.  Plaintiff argues records from medical sources not considered "acceptable" for social security purposes may nonetheless be given weight.  In this case, Weldon and Blackwell's opinions, despite not being rendered by acceptable medical sources, should have been given weight by the ALJ.  They were Plaintiff's sole treating sources throughout the relevant period, they conducted formal mental status evaluations that yielded clinical findings, and they dispensed psychiatric medications, observed her responses to medications, and adjusted them accordingly.  There are no other acceptable medical sources who have examined and treated Plaintiff with the regularity and frequency of these medical professionals.  Moreover, the records from Weldon and Blackwell were endorsed by medical doctors at the Tuolumne clinic.  Although these family practitioners who co-signed the records from Weldon and Blackwell may not have been specialists in the mental health field, that fact alone does not render all their findings of no value or evidentiary weight.  Plaintiff argues this evidence should have been given consideration and weight by the ALJ.

### 2.    Commissioner's Argument

The Commissioner argues the ALJ supplied legally sufficient reasons for rejecting the records from Weldon and Blackwell based on the testimony of Dr. Mohammed, who specifically reviewed and addressed that evidence.  Dr. Mohammed noted the limitation-opinions submitted by Blackwell and Weldon were not actually co-signed by a physician and neither had a specialty in psychiatry.  Dr. Mohammed explained this was important because he did not find objective testing or other sufficient evidence to support their opinions.  In addition to crediting Dr. Mohammed's opinion in this regard, the ALJ also noted that the records were in conflict with the other medical evidence in the record, and did not reflect any interaction, evaluation, or treatment with the family practitioner overseeing Weldon and Blackwell.  According to the Commissioner, this is precisely the type of germane reasoning sufficient to reject this type of medical evidence under *Britton v.*

1    *Colvin*, 787 F.3d 1011 (9th Cir. 2015) and complied fully with the requirements set forth in Social

2    Security Ruling ("SSR") 96-2p, 1996 WL 372188.

3          **3.     Analysis**

4          An ALJ is required to provide specific and legitimate reasons to reject the testimony of a

5    medically acceptable treating source whose opinion is contradicted.  *Valentine*, 574 F.3d 692.

6    Only licensed physicians and certain other qualified specialists are considered "[a]cceptable

7    medical sources" under the regulations.  20 C.F.R. § 404.1513(a).  Physician's assistants and

8    nurses are considered "other sources" under § 404.1513(d), and are not entitled to the same

9    deference as licensed physicians.  20 C.F.R. § 404.1527; SSR 06-03p.  The ALJ may discount

10   testimony from those "other sources" by giving reasons germane to each witness.  *See Turner v.

11   Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010) (quoting *Lewis v. Apfel*, 236 F.3d 503,

12   511 (9th Cir. 2001)).

13         Blackwell completed a form indicating, among other things, that Plaintiff was incapable of

14   work involving even "low stress," Plaintiff would experience deterioration or decompensation in

15   work or work-like settings and would likely be absent from work more than three times per month

16   due to her mental impairments.  (AR 518-19.)  Weldon completed a form in September 2010

17   indicating Plaintiff had bipolar disorder and a mood disorder which caused her to experience low

18   energy, insomnia, and anxiety.  (AR 408.)  She found Plaintiff markedly limited in her ability to

19   perform activity over a normal workday and workweek on an on-going basis in a competitive

20   work environment; understand and remember detailed instructions; maintain attention and

21   concentration; and work in coordination with or proximity to others without being distracted by

22   them.  (AR 409.)  She indicated Plaintiff was moderately to markedly limited in her ability to

23   accept instructions and respond appropriately to criticism from a supervisor; get along with co-

24   workers without distracting them or exhibiting behavior extremes; respond appropriately to

25   changes in the work setting; and set realistic goals or make plans independently.  (AR 410.)  She

26   indicated Plaintiff could not tolerate even "low stress" in the workplace.  (AR 412.)  Neither of

27   these opinions was co-signed by a physician.  (*See* AR 412, 519.)

28

                                    19

1    In *Britton*, the claimant presented evidence from a nurse practitioner, Michael Keith

2  ("Keith"), who opined the plaintiff could not work due to fibromyalgia.  787 F.3d at 1013.  The

3  ALJ discounted Keith's testimony in favor of testimony offered by a medical expert who testified

4  at the hearing that the plaintiff was capable of light work.  *Id.*  The ALJ noted the plaintiff's daily

5  activities, including home-schooling her children, discredited Keith's opinion.  *Id.*  The appellate

6  court found these germane reasons to discount Keith's opinion.  *Id.*  The plaintiff also argued that,

7  pursuant to *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996), Keith's testimony should have

8  been accorded deference as medical testimony because Keith worked closely with two doctors.

9  However, the appellate court noted nothing in the record indicated Keith worked so closely with

10 any doctor as to be considered an agent of a physician, as required under *Gomez*.  *Id.*  Instead, the

11 record reflected the doctors did not know Keith because he worked in a different group, suggesting

12 Keith did not work closely at all with those doctors.  The court concluded the ALJ properly

13 considered the records from Keith.  *Id.*

14    Like the nurse practitioner in *Britton*, Weldon and Blackwell are not acceptable medical

15 sources, and their opinions are not entitled to controlling weight.  *Britton*, 787 F.3d at 1013.  The

16 ALJ was still required, however, to consider their opinions and could reject them only by stating

17 germane reasons for doing so.  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).  Although

18 Plaintiff claims the ALJ rejected the opinions of these medical providers *only* because they were

19 not acceptable medical sources, the ALJ's decision and the testimony of Dr. Mohammed refute

20 this characterization of the ALJ's reasoning.   In June 2012, Plaintiff's counsel specifically

21 questioned Dr. Mohammed about Weldon and Blackwell's form opinions.  (AR 897-902.)  Dr.

22 Mohammed noted that Weldon is a family nurse practitioner, and not only are nurse practitioners

23 not "acceptable medical sources," Weldon was not even a psychiatric nurse practitioner who

24 would have experience with the type of cognitive issues Plaintiff was experiencing.  (AR 898.)

25 Similarly, Blackwell was not a psychologist or a medical doctor, and thus she was not an

26 "acceptable medical source."  (AR 898.)  Dr. Mohammed testified the opinions would have been

27 more persuasive had they been signed by a psychiatrist.  (AR 902.)  Even had they been signed by

28

1    a medical doctor, because Plaintiff's condition was psychiatric in nature, only a psychiatrist would

2    be able to offer a persuasive opinion on Plaintiff's psychiatric conditions.  (AR 902.)

3         In considering the opinions of these medical sources, the ALJ noted that Dr. Mohammed

4    had explained Weldon and Blackwell were not acceptable medical sources, and did not have the

5    education, experience, and expertise to properly assess, diagnose, or treat mental health matters.

6    In contrast, the ALJ noted Dr. Mohammed, who rendered an opinion contrary to the 2010 opinions

7    of Blackwell and Weldon, was more experienced and had greater expertise; thus his opinion was

8    "far more persuasive in mental health matters."  (AR 29.)

9         The ALJ's decision reflects rejection of Blackwell and Weldon's opinions because, in

10   addition to being unacceptable medical sources, they did not have expertise and experience in the

11   mental health field whereas Dr. Mohammed was a specialist in this area.  Favoring the opinion of

12   a specialist is legitimate.  *Andrews v. Shalala*, 53 F.3d 1035, 1042 (9th Cir. 1995) (citing 20

13   C.F.R. § 416.927(d)(5) ("We give more weight to the opinion of a specialist about medical issues

14   related to his or her area of specialty than to the opinion of a source who is not a specialist.")).

15   This is a germane reason to reject Blackwell and Weldon's opinions, and it goes beyond the

16   observation they were not acceptable medical sources under the regulations.  As Dr. Mohammed

17   noted, even a medical doctor would not necessarily have the experience and expertise to diagnose

18   Plaintiff's mental conditions or treat them – even to the extent that frequently occurs in the day-to-

19   day medical world.  And although Dr. Renwick co-signed a letter regarding Plaintiff's condition,

20   there is no evidence he himself actually treated Plaintiff beyond prescribing medication on the

21   recommendation of Weldon and Blackwell or that he had the opportunity to examine or observe

22   Plaintiff.  The ALJ was entitled to discount the opinions in the face of a specialist who disagreed,

23   albeit a non-examining one.  *See Andrews v. Shalala*, 53 F.3d 1035, 1042 (9th Cir. 1995) (citing

24   *Torres v. Sec'y of Human & Health Servs*., 870 F.2d 742, 744 (1st Cir. 1989) (greater weight may

25   be given to opinion of nonexamining expert who testifies at hearing subject to cross-

26   examination)).

27        The ALJ also stated the opinions of Blackwell and Weldon were not consistent with other

28   medical evidence, which is supported by the record.  Their functional limitation opinions

21

1   contrasted with the opinions of Dr. Lampe (AR 190-91), Dr. Garcia (AR 203-05), Dr.

2   Tyutyulkova (AR 245), Dr. Fetterman (AR 520-26), and Dr. Mohammed (AR 896), all of whom

3   are mental health specialists.  This too was a germane reason to discount the opinions of Blackwell

4   and Weldon.

5   **B.      Substantial Evidence Supports the October 2011 Onset Date**

6         Plaintiff contends the ALJ failed to consider the reasons for her termination from her

7   employment in March 2007 as directed by the Appeals Council, and wrongly relied on Dr.

8   Fetterman's diagnosis of Plaintiff's amnestic disorder in October 2011 to determine her disability

9   onset date.  According to Plaintiff, the evidence of her termination reflects that she became

10  disabled in March 2007 when she was fired because she had many job-performance issues related

11  to her mental condition.  Additionally, after her termination, her doctor told her she should not

12  work because of symptoms stemming from her anxiety problems.

13        The Commissioner argues the October 2011 onset date determined by the ALJ was

14  properly supported by the testimony of Dr. Mohammed.  The Commissioner contends Plaintiff is

15  urging the Court to impermissibly reweigh the evidence to determine the onset date should be

16  March 2007 instead.  The only relevant question, according to the Commissioner, is whether the

17  onset date determined by the ALJ is supported by substantial evidence.

18        The ALJ's determination of a claimant's disability onset date must be supported by

19  substantial evidence.  *Swanson v. Sec'y of Health & Human Servs.*, 763 F.2d 1061, 1064 (9th Cir.

20  1985).  Although Plaintiff claims the onset of her disability began in March 2007, the ALJ

21  determined Plaintiff's disability did not begin until October 2011, when she met the criteria for

22  Listing 12.02.

23        Social Security Regulation ("SSR") 83-20 (1983) provides the following, in relevant part:

24      [i]n determining the date of onset of disability, the date alleged by the individual
    should be used if it is consistent with all the evidence available . . . [T]he
25  established onset date must be fixed based on the facts and can never be
    inconsistent with the medical evidence of record.
26

    . . .
27  In some cases, it may be possible, based on the medical evidence to reasonably
    infer that the onset of a disabling impairment(s) occurred some time prior to the
28  date of the first recorded medical examination, e.g., the date the claimant stopped

working.  How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medical basis.  At the hearing, the [ALJ] should call on the services of a medical advisor when onset must be inferred.  If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

Listing 12.02 relates to Organic Mental Disorders, under which Plaintiff was found disabled.  The required severity for these disorders is met when the requirements of both A and B are satisfied, or when the requirements in C are satisfied:

A.    Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
      1.  Disorientation to time and place; or
      2.  Memory impairment, either short-term (inability to learn new information), intermediate or long-term (inability to remember information that was known sometime in the past); or
      3.  Perceptual or thinking disturbances (e.g., hallucinations, delusions); or
      4.  Change in personality; or
      5.  Disturbance in mood; or
      6.  Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or
      7.  Loss of measured intellectual ability of at least 15 I.W. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuro-psychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.

      AND

B.    Resulting in at least two of the following:

      1.  Marked restriction of activities of daily living; or
      2.  Marked difficulties in maintaining social functioning; or
      3.  Marked difficulties in maintaining concentration, persistence, or pace; or
      4.  Repeated episodes of decompensation, each of extended duration.

Dr. Mohammed testified Plaintiff met element (2) under category A because Plaintiff has complained about memory impairment, which was demonstrated by clinical testing done by Dr. Fetterman in October 2011.  (AR 891.)  He testified Plaintiff also met elements (4) and (5) under category A based on the testing results during Plaintiff's examination with Dr. Fetterman  (AR 891 ("Okay, so again, memory impairment, which she has complained about and also documented in 24F by testing, so that will be number 2.  Change in personality, number 4, disturbance in mood, number 5.").)  Dr. Fetterman opined Plaintiff had marked limitation in the ability to make

23

judgments about complex work-related matters, and in her ability to understand, remember, and carry out complex instructions, which related to category B.  (AR 524.)  Given these marked limitations, Dr. Mohammed determined Plaintiff met the criteria of Listing 12.02 as of October 14, 2011, the date when there was evidence of concrete limitations and a diagnosis by Dr. Fetterman of amnestic disorder.  (AR 895.)  The ALJ specifically asked Dr. Mohammed whether an earlier onset date should be assigned, but Dr. Mohammed explained that prior to the October 2011 examination with Dr. Fetterman, Plaintiff's functional limitation was not clear.  (AR 895.)   In the previous records, Dr. Mohammed also found only mild limitations in activities of daily living, social function, and concentration, persistence, and pace.

Plaintiff contends her termination from work in March 2007 is sufficient evidence of limitation in Plaintiff's functional abilities to assign an earlier onset date, and was a factual matter the Appeals Council specifically required the ALJ to consider.  In its decision, the Appeals Council stated the ALJ was to consider "that the claimant apparently worked professionally at the clinic until the alleged onset date" in March 2007.  Plaintiff contends "[t]he implication of that directive is clear:  that [] the reasons for Ms. Little's termination from her employment warrant exploration, as those reasons may have been related to her psychiatric impairments, which would favor March 13, 2007, as the proper onset date of her disability."  (Doc. 21, 20:11-15.)  The question presented, however, is not whether or how well the ALJ complied with the Appeals Council's remand order – even if it could be interpreted to require the ALJ to conduct explicit consideration of Plaintiff's termination in considering an onset date.  The question before a reviewing court is whether there is substantial evidence to support the ALJ's selected onset date. *Swanson*, 763 F.2d at 1065.

In *Swanson*, the claimant developed a nerve disorder in October 1977 and underwent surgery in January 1978.  763 F.2d at 1063.  Over the next few years, Swanson continued to suffer from a variety of disorders including a nerve disorder similar to that which caused her initial surgery.  *Id.*  Although she complained of severe pain, her physicians were at a loss to explain her problems in light of negative test results which led them to conclude her complaints were primarily subjective.  *Id.*  Her treating physician since May 1979 was of the opinion that she had

1   been disabled for the entire period he treated her, as did another physician who provided a report

2   on her behalf.  *Id.*  However, several other doctors, both before and after 1980 were unable to find

3   any significant problems with Swanson and concluded she was not disabled.  *Id.*  In considering

4   the conflicting evidence, the ALJ concluded Swanson was not disabled prior to August 1980, and

5   the appellate court affirmed holding the ALJ's conclusion was supported by substantial evidence.

6   *Id.* at 1065.

7       The *Swanson* court noted the first tests indicating a severe, disabling condition were EKG

8   and treadmill test results on August 19, 1980.  However, the court noted that Swanson's multiple

9   hospitalizations and subjective complaints of pain indicated she suffered some impairment prior to

10  August 1980.  Yet, prior to 1980, there were a "large number" of negative test results coupled with

11  Swanson's admission that she improved after surgical procedures and had stopped medication

12  indicating her impairment was not so severe as to render her disabled before August 19, 1980.

13  The court emphasized the ALJ could have chosen an earlier onset date based on the conflicting

14  evidence, but the issue was "whether the chosen onset date [was] supported by substantial

15  evidence, not whether an earlier date could have been supported."  *Id*.  The appellate court

16  provided a caveat, however, that the date a condition is diagnosed is not dispositive to onset date:

17  "the critical date is the date of *onset* of disability, *not* the date of diagnosis."  *Id.* at 1065.  The

18  court emphasized Swanson's record contained substantial evidence that the date of onset and the

19  diagnosis coincided to justify selection of the onset date selected.

20      This case is similar to *Swanson* as there is evidence suggesting limitation prior to the date

21  Plaintiff was diagnosed with amnestic disorder by Dr. Fetterman.  Although amnestic disorder was

22  not diagnosed until October 2011, that alone is not controlling for selection of onset date.  The

23  question is whether there was functional limitation prior to that date that would have rendered

24  Plaintiff disabled at an earlier time than the date she met Listing 12.02.  The evidence here is

25  susceptible to two reasonable conclusions.

26      On the one hand, Plaintiff's termination from work due to her inability to file items

27  correctly and stay focused, combined with treating notes show Plaintiff suffered a lack of

28  motivation (AR 225-26), insomnia (AR 223-24), suicidal thoughts (AR 234), and forgetfulness at

various points prior to 2011 is evidence that suggests she was suffering functional limitation.  The degree to which Plaintiff was limited, however, is not documented.  While Weldon and Blackwell provided their opinions as to Plaintiff's concrete functional limitations, those opinions were rejected for sufficiently germane reasons.

On the other hand, having reviewed the medical records, Dr. Mohammed opined Plaintiff did not exhibit specific functional limitation until examined in 2011, and he repeatedly opined Plaintiff did not meet the criteria of Listing 12.02 prior to October 2011.  (AR 890-902.)  Several other examining and non-examining state agency psychiatrists also agreed that Plaintiff was not more than mildly to moderately limited in functional abilities before October 2011.  (*See* AR 190-91 (examining psychiatrist Dr. Lampe noted no functional limitations in June 2008); AR 203-05 (Dr. Garcia noted only moderate limitation in Plaintiff's ability to remember, understand, and carry out complex instructions in 2008); AR 245 (Dr. Tyutyulkova noted no more than minimal limitations in Plaintiff's functional abilities in March 2009).)  Dr. Mohammed's view of Plaintiff's functional abilities was supported by the opinions of several physicians who examined Plaintiff, and was credited by the ALJ.

Dr. Mohammed's opinion regarding Plaintiff's symptomatology is substantial evidence on which the ALJ was entitled to rely in selecting Plaintiff's October 14, 2011, onset date.   In sum, although Plaintiff presents a reasonable view of the evidence, the Court cannot supplant the ALJ's reasoning and conclusion which is reasonable and supported by substantial evidence.

## C.     The ALJ's Consideration of Plaintiff's Symptom Testimony

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged.  *Id*.  The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."  *Id*. (quoting *Lingenfelter*, 504 F.3d at 1036).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can

only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection.  *Id*.  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin*., 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529, 416.929.  Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains.  *Light v. Soc. Sec. Admin*., 119 F.3d 789, 792 (9th Cir. 1997).

Plaintiff argues that in considering her subjective lay testimony, the ALJ merely stated she was not credible and supplied no reasoning.  Specifically, the ALJ's decision recites only that Plaintiff's statements concerning the intensity, persistence, and limiting effects of Plaintiff's symptoms were not credible prior to October 14, 2011, to the extent they were not consistent with the ALJ's RFC assessment.  Plaintiff contends that such a conclusory statement falls short of satisfying the ALJ's obligation to discuss the evidence and supply the reason or reasons upon which the ultimate determination is based.  Plaintiff contends the Ninth Circuit recently rejected the identical conclusory boilerplate in *Treichler v. Commissioner of Social Security Administration*, 775 F.3d 1090, 1102 (9th Cir. 2014).

The Commissioner does not directly address Plaintiff's argument or discuss the similarities of the ALJ's reasoning in this case with those provided in *Treichler*.  Rather, the Commissioner supplies citation to evidence in the record that she asserts contradicts and detracts from the weight of Plaintiff's lay statements.

In *Treichler*, the ALJ rejected the claimant's subjective symptom testimony by making a single general statement:   "the claimant's symptoms concerning the intensity, persistence and

limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." *Id.* at 1102-03.  The court held this was error.  *Id.* at 1103.  The Commissioner argued the error was harmless because the ALJ summarized the evidence supporting the RFC, and it could be inferred that the ALJ rejected the claimant's testimony to the extent it conflicted with that medical evidence.  *Id.*  The court rejected this reasoning noting it could not substitute its conclusion in place of the ALJ's or speculate as to the grounds for the ALJ's conclusion.  *Id.*

Here, like *Treichler,* the ALJ supplied only the introductory phrase that Plaintiff's lay testimony was discredited to the extent it was not consistent with the RFC.  Although the Commissioner offers examples from the medical evidence and Plaintiff's daily activities that seem to support the ALJ's discounting of Plaintiff's credibility, this was not reasoning offered by the ALJ in the first instance.  The ALJ erred in failing to supply clear and convincing reasons to discount Plaintiff's lay testimony prior to October 14, 2011.  *Treichler*, 775 F.3d at 1103.

However, in this case, the error is not prejudicial.  *See Molina*, 674 F.3d at 1121-22 (no presumption of prejudicial error operates, and the error must be considered in light of the circumstances of the case).  Even crediting Plaintiff's statements about her limitations prior to October 14, 2011, there remains substantial evidence to support the ALJ's pre-October 2011 RFC assessment.  Prior to October 2011, the ALJ found Plaintiff had mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.  (AR 25.)  The ALJ formulated the following RFC: Plaintiff retained the ability to perform medium exertional work, with the ability to sit, stand, and walk 6 hours each in an eight-hour day; limited to work involving simple, routine, and repetitive tasks, with frequent public, coworker, and supervisor contact.  (AR 25.)

In May 2008, Plaintiff described her limitations.  (AR 100-07.)  She stated that some days she was able to go to her doctors' appointments, play with her niece, and take her daughter to school.  However, "most of the time" there were so many thoughts in her head which she could not control, and this led her to cry, isolate herself, and blames herself for the actions of others.

(AR 100.)  She cares for her daughter with her family's help, but she stated she was unable to concentrate, communicate, or remember things, and she often felt like everyone was against her. (AR 101.)  She noted she was very forgetful, but she was able to take care of all her daily personal needs such as bathing and feeding herself.  (AR 101.)  She stated she could not remember to take her medication, and she forgets appointments; she cannot cook because she forgets to turn off the stove burners.  She likes to work in the yard, and she shops for personal needs whenever someone else is going and is able to give her a ride.  (AR 103.)  She is able to pay bills, count change, and handle both a checking and savings account.  (AR 103.)  She spends time with others, she attends church when she receives a ride, and she watches television.  (AR 104.)  She can only pay attention for a minute or two, and she struggles to follow written or spoken directions.  (AR 105.) She cannot handle stress "at all," and it causes her mood to change.  (AR 106.)

At the hearings in 2010 and 2012, she made similar statements of her limitations. Synthesizing these statements and accepting them as true, prior to 2011 Plaintiff has impaired concentration and memory, but she was able to handle her own finances, watch television, play with her niece, and take her daughter to school.  She retreats and withdraws from others when her mood changes or she experiences unspecified stress, but she is able to enjoy activities with her family and attends church regularly.  Plaintiff does not explain, nor does the Court discern, how these limitations and abilities undercut the ALJ's RFC limiting Plaintiff to simple, repetitive tasks. Plaintiff states she has difficulty with stress and she has a resulting impulse to withdraw and blame herself for the actions of others, but does not specify how often she suffers these feelings or how often they disturb her ability to interact with others.  She is limited to only frequent as opposed to constant contact with co-workers, supervisors, and the public which appears to account for her difficulty interacting with others.

Such symptoms as forgetfulness and Plaintiff's limited ability to concentrate – which she reported at various times to treating medical personnel – appear to be features of her amnestic disorder diagnosed by Dr. Fetterman, which suggests Plaintiff's amnestic disorder existed earlier than 2011.  However, for purposes of Listing 12.02, her memory loss was not "medically documented" on objective testing until October 2011, which is required under Listing 12.02.

Thus, Plaintiff's lay reporting of her symptoms prior to 2011 does not establish an earlier onset date for the Listing, and Dr. Mohammed found there was no concrete evidence of memory impairment prior to Dr. Fetterman's examination.  More importantly, Plaintiff's reported symptoms do not show the *degree* of her functional impairment.  Although she experienced mood swings, there is no statement how often she experienced them or how they affected her relationships other than she experienced them and they caused her to withdraw.  While she said her concentration problem prohibited her from focusing for more than one or two minutes, she maintained she could handle her own finances, watch television, and read.  In considering those statements, how her concentration difficulties affected her ability to perform simple, repetitive tasks is unclear. This is distinguishable from *Treichler* where the claimant testified to concrete physical limitations from pain that were directly contrary to the RFC determination by the ALJ.  Crediting Treichler's statements as true would have clearly affected the disability decision, which is not the case here. *Stout v. Comm'r of Soc. Sec. Admin*., 454 F.3d 1050, 1055 (9th Cir. 2006) (error is harmless if it is inconsequential to the disability determination).

In sum, crediting Plaintiff's statements alone does not establish concrete functional impairment greater than assessed by the ALJ.

### CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence. Accordingly, the Court AFFIRMS the ALJ's decision.  The Clerk of the Court is DIRECTED to enter judgment in favor of Carolyn Colvin, Acting Commissioner of Social Security and against Plaintiff Lena Little.

IT IS SO ORDERED.

Dated:   **January 26, 2016**                                    **/s/ Sheila K. Oberto**
                                                             UNITED STATES MAGISTRATE JUDGE